IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 37185-9-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| CODY OMAR HARRIS, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Cody Harris appeals his convictions for two counts of third degree assault and one count of unlawful possession of a controlled substance (UPCS). We deny his arguments on appeal but remand for the trial court to vacate Harris's UPCS conviction and to resentence him in light of *State v. Blake*, 197 Wn.2d 170, 481 P.3d 521 (2021).

FACTS

Law enforcement responded to a disturbance involving Cody Harris and his partner, Kristen Tisdale. Officer Zachariah Moore saw Harris, Ms. Tisdale, and another female all yelling at each other outside an apartment. Officer Moore requested backup, and Officer Brandon Leander arrived shortly thereafter.

The officers separated the parties. Officer Leander walked the females away from the apartment toward the road. Officer Moore asked Harris about the reported incident, but Harris was fixated on Ms. Tisdale and repeatedly asked, "[A]re you serious[?]" Report of Proceedings (RP) (Oct. 21 & Oct. 24, 2019) (Trial) at 23. Officer Moore went to ask Officer Leander if there was probable cause for an arrest or if any further actions were needed. Officer Leander responded that Ms. Tisdale said Harris had grabbed her arm and pushed her earlier in the day.

While the officers were speaking, Harris approached the officers and the two women. When Officer Moore told Harris to get back, he refused and gestured aggressively. Harris paced back and forth while slowly moving closer to the officers. He was still looking at Ms. Tisdale.

Harris then stepped toward Officer Moore. He was less than 10 inches from Officer Moore's face, although he did not touch him. Officer Moore told Harris to turn around, to which he responded "'no.'" RP (Oct. 21 & Oct. 24, 2019) (Trial) at 117. The officers then grabbed Harris's arms, dragged him to the ground, and told him he was under arrest.

Harris kicked and flailed to avoid being handcuffed. During the struggle, Harris kicked Officer Moore's right hand. Officer Leander handcuffed Harris's left wrist, but

Harris grabbed and twisted the officer's fingers with his right hand. Officer Leander

freed his fingers and handcuffed Harris's right wrist.

A search incident to arrest revealed a small vial containing a substance later

identified as cocaine in Harris's pocket. After receiving medical clearance, Harris was

booked into jail.

The State originally charged Harris with third degree assault against Officer

Leander. Later, the State additionally charged Harris with third degree assault against

Officer Moore and UPCS.

*Trial court proceedings*

At an omnibus hearing shortly after arraignment, Harris's first counsel indicated he

might pursue a diminished capacity defense. Counsel moved for a competency

evaluation, which the court granted. Cory Fanto, PhD, found Harris competent to stand

trial. Dr. Fanto diagnosed Harris with alcohol use disorder, cocaine use disorder, and

antisocial personality disorder. Harris reported a history of bipolar disorder and said he

was prescribed medications for that condition as well as for posttraumatic stress disorder

(PTSD) and depression. Dr. Fanto did not observe mood disturbance, thought disorder,

hallucinations, or active psychosis. Harris would not engage in some tasks, including one

to assess his abstract thinking abilities.

On July 3, 2019, the court entered an order of competence. The case proceeded to

trial. On the first day of trial, defense counsel advised the court of Harris's mental health

issues, noting that Harris "always had a difficult time staying in the courtroom and

controlling his behavior." RP (Aug. 7, 2019) (Mistrial) at 11. She explained that Harris

left the room during his competency evaluation and refused to answer questions. She

further explained:

> After we had the Eastern State Hospital evaluation and [Harris's] refusal to answer the simplest of questions so the doctor could, you know, properly evaluate him, he and I had a number of discussions after that about having a diminished capacity evaluation—he would actually have to participate in the evaluation—and the importance of that. He decided— and, again, we revisited this a number of times—that he did not want to have a diminished capacity evaluation. He wanted to go to trial because he's not guilty.
> . . . .
> And I didn't feel that forcing him into that would do anybody any good because, if he didn't participate in the evaluation, the doctor is certainly not going to be able to render any type of opinion.

RP (Aug. 7, 2019) (Mistrial) at 14-15.

Harris had not taken his medication the night before trial and had difficulty

controlling himself while in the courtroom. This led to the court declaring a mistrial

before opening statements and appointing new counsel for Harris.

Harris's new counsel moved for a competency evaluation over Harris's objection.

The court granted the motion on September 25, 2019. In his evaluation, Dr. Fanto again

4

concluded that Harris was competent to stand trial. The report reproduced portions of the prior report and added interim history including new medications. Dr. Fanto reviewed and summarized a chemical dependency evaluation from 2016, which listed diagnoses of severe substance abuse disorders. No symptoms of psychosis were reported absent substance use. A behavioral health evaluation from 2018 listed diagnoses of insomnia, social anxiety disorder, and dysthymia. Dr. Fanto found no information on Harris's reported bipolar diagnosis, which "raises considerations of a potential mood disturbance (hypomania)." Clerk's Papers (CP) at 87. However, he found insufficient data to support such a diagnosis. He reported that Harris "remains at risk of acting out in the courtroom . . . . However, such behavior is under Mr. Harris' volitional control . . . ." CP at 87. The court entered a competency order on October 9, 2019.

*Motion to suppress*

After the State amended its information to include the UPCS charge, Harris moved to suppress the evidence of cocaine. He argued the officers lacked probable cause to arrest him; therefore, the arrest and subsequent search were unlawful. The court heard argument on the motion prior to trial. Officer Moore and Harris testified.

Officer Moore testified that he responded to a domestic disturbance, encountered Harris and two females yelling, and separated them. While Officer Leander spoke with

5

Ms. Tisdale, Harris was "very agitated and very fixated on her," and "also upset with us for separating her." RP (Oct. 21 & Oct. 24, 2019) (Trial) at 25. Harris then approached the officers aggressively, clenching his fists and puffing up his chest, and refused to back down. Officer Moore explained:

> I was attempting to conduct the investigation; however when [Harris] came out and he was acting very aggressively[,] I had to divert my attention and stop from what I was investigating to deal with him and make sure that it wasn't going to go sideways or turn into . . . a violent confrontation.

RP (Oct. 21 & Oct. 24, 2019) (Trial) at 26. When Harris took a step toward Officer Moore, he said: "I took it to mean that [Harris] was going to assault [Ms. Tisdale] and possibly assault me . . . ." RP (Oct. 21 & Oct. 24, 2019) (Trial) at 27. The officers had to physically restrain Harris to arrest him. Officer Moore stated that Harris's actions delayed his investigation of the domestic violence incident.

Harris testified that on the day of the incident, he did not notice the officers until they were outside talking with Ms. Tisdale and her friend. He said he was just at the house drunk and did not know why the police were there. He said the officers could tell he was under the influence and heavily intoxicated. He claimed the officers did not say who they were. He further claimed he was taken to the ground just for leaving his house. On cross-examination he again said, "My intent that day, right, was to get drunk, you know, consume cocaine or whatever, you know. That was my intent." RP (Oct. 21 &

6

Oct. 24, 2019) (Trial) at 42.  He also said: "I was on my medication, too.  I was—I wasn't

quite, quite intoxicated."  RP (Oct. 21 & Oct. 24, 2019) (Trial) at 43.

After the hearing, the court entered the following findings of fact:

> 1.  On 04/19/2019, . . . Kennewick Police were dispatched to a disturbance . . . .  Dispatched [sic] advised that a third party reported the defendant was at the location, intoxicated, causing a disturbance, and possibly had assaulted Kristen Tisdale at the location, earlier in the day.
> 2.  Officer Moore arrived at the location with Officer Leander.  The defendant was standing in the doorway of the residence yelling at two females outside. . . .
> 3.  Officer Leander moved the females . . . away from the home, while Officer Moore attempted to speak to the defendant.
> 4.  The defendant ignored Officer Moore's attempts to talk to him. . . .
> 5.  Officer Moore then left the defendant for a moment to speak with Officer Leander.  Officer Moore was informed that Tisdale had reported that the defendant had pushed her earlier in the day.
> 6.  While Officer Moore was speaking to Officer Leander, . . . the defendant was still visually fixated on Tisdale and began walking towards the officers, while staring past them at Tisdale.
> 7.  Officer Moore gave a verbal directive to the defendant to "get back".  When he said this, the defendant clenched his fists at his side and puffed his chest up.  The defendant then took a step towards Officer Moore.
> . . . .
> 9.  . . .  Officer Moore believed the defendant would not only attempt to assault Tisdale, but also himself and Officer Leander. . . .  Officer Moore grabbed [Harris's] right arm and told him to put his arms behind his back. . . .
> 10.  . . .  Officers ultimately had to take the defendant to the ground.
> . . . .
> 14.  The defendant's testimony established that he was heavily intoxicated during this incident. . . .

15. The defendant's memory of the events appeared to be directly from the police reports, as opposed to his own independent recollection.

16. Therefore, the Court finds Officer Moore's testimony to be more credible, and it is the basis for the facts stated above.

CP at 144-46. The court entered the following conclusions of law:

1. A person is guilty of obstructing a law enforcement officer if the person willfully hinders, delays, or obstructs any law enforcement officer in the discharge of his or her official powers or duties. RCW 9A.76.020.

2. Officers Moore and Leander were acting in their official duties in investigating a possible assault, when the defendant approached them and refused to obey their commands to stay back. This conduct delayed their investigation.

3. At a minimum, Officers had probable cause to arrest the defendant for [o]bstructing a law enforcement officer. As such, the arrest was lawful as was the search incident [to] arrest, which resulted in the discovery of the suspected cocaine.

CP at 146-47. The court denied Harris's motion to suppress.

The case proceeded to trial again. Harris took the stand and described his recollection of the incident consistent with his testimony at the suppression hearing. He testified that he did not intend to assault either officer and only wanted to "look [at] who was standing by [Ms. Tisdale]." RP (Oct. 21 & Oct. 24, 2019) (Trial) at 161. He talked about the medications he took, including one for bipolar disorder.

At the close of evidence, while the parties discussed jury instructions, Harris (not his counsel) requested a diminished capacity instruction. Harris informed the court he had requested diminished capacity before but his attorney told him they would need an

expert. The court found insufficient evidence to support the instruction and denied his request.

The jury found Harris guilty of two counts of third degree assault and unlawful possession of cocaine. The trial court entered concurrent sentences for the three convictions. Harris timely appealed.

## ANALYSIS

SUPPRESSION OF EVIDENCE

Harris contends the trial court erred in denying his motion to suppress the evidence of cocaine. He argues the officers lacked probable cause to arrest him; therefore, the fruits of the search should have been suppressed. Because of a change in controlling law, we need not address this contention.

In *Blake*, the Supreme Court held that the UPCS statute was unconstitutional because it did not require the State to prove the defendant intended to possess the unlawful substance. Because *Blake* was decided after briefing, we asked the parties to confer and see if they could reach an agreement on the status of Harris's UPCS conviction. We received the State's response but not Harris's. The State said it would file a motion and order vacating the UPCS conviction but requested additional time to

9

develop a mechanism for refunding legal financial obligations paid as a result of the now

invalid UPCS convictions.

We note that vacation of the UPCS conviction will reduce Harris's offender score.

We remand for the trial court to vacate Harris's UPCS conviction and for resentencing.

The trial court can consider the best process for refunding legal financial obligations.

INEFFECTIVE ASSISTANCE OF COUNSEL

Harris contends his counsel was ineffective for failing to pursue a diminished

capacity defense.  We disagree.

Effective assistance of counsel is guaranteed by both the state and federal

constitutions.  *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011).  To prevail on an

ineffective assistance of counsel claim, a defendant must show that counsel's

performance was deficient and the deficiency prejudiced the defense.  *State v.*

*Cienfuegos*, 144 Wn.2d 222, 226-27, 25 P.3d 1011 (2001) (quoting *Strickland v.*

*Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).  "The

threshold for the deficient performance prong is high, given the deference afforded to

decisions of defense counsel in the course of representation."  *Grier*, 171 Wn.2d at 33.

Although there is "a strong presumption that counsel's performance was reasonable,"

*State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009), a defendant can rebut that

presumption "by demonstrating that 'there is no conceivable legitimate tactic explaining counsel's performance.'" *Grier*, 171 Wn.2d at 33 (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)). We review claims of ineffective assistance of counsel de novo. *State v. A.N.J.*, 168 Wn.2d 91, 109, 225 P.3d 956 (2010).

A defense counsel's failure to present a diminished capacity defense satisfies both prongs of *Strickland* only if the facts support the defense. *State v. Tilton*, 149 Wn.2d 775, 784, 72 P.3d 735 (2003). As with all ineffective assistance of counsel claims, this analysis depends on the facts of each particular case. *Cienfuegos*, 144 Wn.2d at 228-29.

Harris relies on *State v. Fedoruk*, 184 Wn. App. 866, 339 P.3d 233 (2014). Fedoruk was charged with second degree murder. He had a long history of mental illness including a head injury, diagnosed schizophrenia, poor compliance with medications, and two admissions to a psychiatric hospital. *Id.* at 871. He had previously been found not guilty by reason of insanity and had been involuntarily committed. *Id.* at 872. While awaiting trial, the court ordered forcible administration of antipsychotics as well as a competency evaluation, where the doctor found Fedoruk had "'major mental illness'" but was currently competent. *Id.* at 874-75. The day before trial, Fedoruk's attorney requested a continuance to pursue an insanity plea. *Id.* at 876. The court denied the continuance, and Fedoruk was convicted as charged.

On appeal, Fedoruk argued his counsel was ineffective for not pursuing a mental health defense. We agreed and determined that defense counsel's failure to investigate a mental health defense, given Fedoruk's history and the bizarre facts leading up to his crime, fell below an objectively reasonable standard. *Id.* at 883. This failure prejudiced Fedoruk, who had been evaluated for competency to stand trial but not for sanity at the time of the crime. *Id.* at 885. We concluded that there was a reasonable likelihood that a more favorable outcome would have been obtained if counsel had pursued a mental health defense. *Id.*

We distinguish *Fedoruk*. Although Harris has substance abuse and antisocial personality disorders, he has never been acquitted by reason of insanity, spent time in a psychiatric hospital, been involuntarily committed, or forcibly medicated. Dr. Fanto was unable to confirm Harris's self-reported bipolar and PTSD diagnoses and observed no psychosis. Finally, given the evidence presented at trial and the medical evaluations, the assaults were more likely related to Harris's extreme intoxication than any mental defect. We conclude that the facts in this case do not support a diminished capacity defense and defense counsel was not ineffective for failing to pursue such a defense.

STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW (SAG)

Harris raises two issues in his SAG, which we address in turn.

12

*SAG #1: Guilty plea at arraignment*

Harris contends the trial court abused its discretion by refusing to accept his guilty plea at arraignment. He argues this is a manifest constitutional error entitling him to reversal. For the reasons below, we disagree.

At arraignment, the judge advised Harris of his rights. Harris interrupted to say he wanted to plead guilty. The judge continued and, when asked whether he wished to be represented by a lawyer, Harris again asked if he could "just plead guilty." RP (Apr. 25, 2019) at 3. The judge replied:

> Well, you can't just plead guilty, no. There would have to be a long colloquy with you, and we'd have to go over if you understand the amount of time you are facing. This deputy prosecutor is Wednesday deputy prosecutor, so I don't know if there has been even an offer letter. So the question for you today is whether you wish to be represented by a lawyer?

RP (Apr. 25, 2019) at 3. Harris said he wanted a lawyer then asked to discuss conditions of release. The court appointed counsel for Harris, entered a plea of not guilty, and set the matter for an omnibus hearing.

A criminal defendant does not have a constitutional right to plead guilty. *State v. Martin*, 94 Wn.2d 1, 4, 614 P.2d 164 (1980). Yet a right to plead guilty has been created by CrR 4.2(a), which identifies pleas that may be accepted at arraignment. *Id.* A

13

defendant should be made aware of all consequences and all possible defenses of a guilty plea. *State v. Haydel*, 122 Wn. App. 365, 370, 95 P.3d 760 (2004).

Here, Harris asked to plead guilty before he had a chance to speak with appointed counsel. The trial court aptly perceived that accepting a guilty plea under such circumstances would be improper because Harris would have been unaware of his possible defenses. Yet because Harris had the right to plead guilty at arraignment, the trial court should have continued the arraignment so Harris could speak with appointed counsel before pleading guilty. Instead of doing this, the court erred by entering a plea of not guilty.

Yet we discern no prejudice. Had the trial court continued arraignment and accepted a guilty plea, the State still could have filed the additional charges that arose out of separate conduct. Had Harris been sentenced for one count of third degree assault and later convicted and sentenced for the two other crimes, those sentences would have been consecutive. RCW 9.94A.589(1)(a). Here, after the jury's verdicts, the trial court entered concurrent sentences on the three convictions. The trial court's refusal to accept a guilty plea at arraignment benefitted Harris because it resulted in concurrent rather than consecutive sentences.

14

We conclude that Harris was not prejudiced by the trial court's failure to allow him to plead guilty at arraignment.

### *SAG #2: Lesser included offense instruction*

Harris next contends his counsel was ineffective for failing to request a lesser included jury instruction for his third degree assault charges. We disagree.

"A jury must be allowed to consider a lesser included offense if the evidence, when viewed in the light most favorable to the defendant, raises an inference that the defendant committed the lesser crime instead of the greater crime." *State v. Henderson*, 182 Wn.2d 734, 736, 344 P.3d 1207 (2015). "If a jury could rationally find a defendant guilty of the lesser offense and not the greater offense, the jury must be instructed on the lesser offense." *Id.*; *see also State v. Coryell*, __ Wn.2d __, 483 P.3d 98, 105 (2021).

Fourth degree assault is elevated to third degree assault if the victim is a law enforcement officer performing his or her duties at the time of the assault. RCW 9A.36.031(1)(g). The uncontroverted evidence at trial was that the two assault victims were both law enforcement officers performing their duties at the time of the assaults. Here, the jury could not have rationally found Harris guilty of fourth degree assault and not guilty of third degree assault. For this reason, Harris was not entitled to

15

No. 37185-9-III
*State v. Harris*

an instruction on fourth degree assault and defense counsel was not ineffective for failing to request such an instruction.

Affirmed in part and remanded for resentencing.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____        _____
Fearing, J.                                                  Staab, J.

16